UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- X
                                      :
JOSEPH PESSIN, on behalf of himself   :
and all others similarly situated,    :
                                      :        22cv2436 (DLC)
                          Plaintiff,  :
                                      :        OPINION AND ORDER
            -v-                       :
                                      :
JPMORGAN CHASE U.S. BENEFITS          :
EXECUTIVE, et al.,                    :
                                      :
                          Defendants. :
                                      :
------------------------------------- X

APPEARANCES:

For plaintiff William R. Underwood:
Teresa S. Renaker
Renaker Scott LLP
505 Montgomery Street
Suite # 1125
San Francisco, CA 94111

Jeffrey Lewis
Keller Rohrback LLP
180 Grand Avenue, Suite 1380
Oakland, CA 94612

David S. Preminger
Keller Rohrback LLP
1140 Avenue of the Americas
New York, NY 10036

DENISE COTE, District Judge:

        Joseph Pessin filed this action on behalf of himself and

others similarly situated under the Employee Retirement Income

Security Act of 1974, as amended, 29 U.S.C. § 1001 et seq.

("ERISA").  Pessin received a pension plan through his former

employer, JPMorgan Chase & Company ("JPMC").  Pessin alleges
that the named administrator of the plan, JPMorgan Chase U.S.
Benefits Executive (the "JPMC Benefits Executive"), violated
three sections of ERISA by failing to disclose certain aspects
of the plan.  He also alleges that the Board of Directors of
JPMC (the "JPMC Board") violated one section of ERISA by failing
to monitor the JPMC Benefits Executive.

Defendants have moved to dismiss Pessin's amended complaint
in its entirety.  For the following reasons, the motion is
granted.

## Background

The following facts are taken as true from the first
amended complaint ("FAC") and documents integral to the FAC.
For the purposes of deciding this motion, plaintiff's factual
allegations are accepted as true, and all reasonable inferences
are drawn in plaintiff's favor.

I.   The Pension Plans

Joseph Pessin started working for J.P. Morgan & Co.
("Morgan") in 1987.  During his employment, Pessin enrolled in a
pension plan provided by Morgan (the "Morgan Plan").  The Morgan
Plan was a traditional defined benefit pension plan that
calculated participants' benefits using a final average pay
benefit formula.  This formula determines a participant's

2

benefits based on factors including the participant's
compensation and years of service.  Because of this, with
certain limitations not relevant here, participants' benefits
would grow as they worked longer and received salary increases.
Under the Morgan Plan, participants could elect to receive their
pensions either as an annuity or a lump sum.

Effective December 31, 1998, the Morgan Plan was amended to
utilize a different benefit formula, known as a cash balance
formula (the "Cash Balance Plan").  A cash balance formula
provides participants with a hypothetical "account balance" and
credits that balance with "pay credits" and "interest credits."
Pay credits, which were referred to in the Cash Balance Plan as
"Morgan credits," are based on a participant's compensation.
Interest credits are based on designated yearly interest rates.

To transition former Morgan Plan participants to the Cash
Balance Plan, Morgan Plan participants received hypothetical
"opening account balances" as of December 31, 1998.  These
opening balances were calculated by converting a Morgan Plan
participant's annuity benefit to a lump sum amount using
actuarial assumptions selected by Morgan.

Additionally, as part of the transition, until December 30,
2003, former Morgan Plan participants' benefits were calculated
using both the cash balance formula and the final average pay

3

formula.  The Cash Balance Plan provided that when former Morgan Plan participants began receiving benefits, they would receive the greater of (1) their benefits under the final average pay formula as of December 30, 2003, or (2) their benefits under the cash balance formula.  The final average pay calculation as of December 30, 2003 would continue to act as a minimum benefit regardless of when participants terminated their employment and began receiving benefits.

Because of these "greater of" provisions, when the plan was converted to a cash balance formula, former Morgan Plan participants accrued no new benefits until their benefit calculation under the new formula exceeded the calculation under the old formula as of December 30, 2003.  This is called "wear-away": in order to start accruing new benefits under the cash balance formula, a participant must first receive enough pay and interest credits to "wear away" the benefit they already accrued under the prior formula.  During the wear-away period, a participant's actual benefits are effectively frozen because any credits they receive merely reduce the gap between their benefits calculation under the new formula and the calculation under the old formula.  As a result, although the participant may continue working, they will see no increase in their benefits until they accrue enough pay and interest credits to

exceed their previously accrued benefits, thus ending the wear-away period.

On December 31, 2000, Morgan merged into Chase Manhattan Bank ("Chase"), creating JPMC, and the Cash Balance Plan merged with a Chase plan, creating the JPMorgan Chase Retirement Plan (the "JPMC Plan").  The JPMC Plan continued the wear-away effects of the Cash Balance Plan.  Thus, Morgan Plan participants' benefits remained frozen as of December 31, 2003, until, if ever, they received enough credits to exceed their previously accrued benefits under the final average pay formula.

II.  The Summary Plan Descriptions

The claims in this action are not about whether it was illegal to put plaintiff's benefits into a state of wear-away. The claims in this action instead turn on whether JPMC effectively communicated this wear-away phenomenon to plan participants through summary plan descriptions ("SPDs"), plan statements, or other disclosures.  During the relevant time, Morgan and JPMC issued SPDs for the Cash Balance Plan and the JPMC Plan, three of which are highlighted in the FAC.

An SPD from January 1, 1999 (the "1999 SPD") introduced the Cash Balance Plan to prior Morgan Plan participants.  The first pages of the 1999 SPD explained the operation of the Cash Balance Plan, noting that the plan provided participants with a

"baseline of steadily growing assets" and that plan

participants' account balances would grow "through Morgan

credits and interest credits."

Near the beginning of the 1999 SPD was a section titled

"How your plan benefit is determined," which explained the

basics of the Cash Balance Plan.  It read in relevant part:

> The Cash Balance Plan is expressed as an account
> balance that increases over time.  Each month your
> account grows from two sources: Morgan credits and
> interest credits.

Further down in a subsection titled "Opening balances on January

1, 1999," it explained:

> If you were a [Morgan Plan] participant on December
> 31, 1998, and you were still employed on January 1,
> 1999, your <u>opening balance under the Cash Balance Plan
> was determined by converting your accrued benefit
> under the prior benefit formula to its lump sum value
> using actuarial assumptions</u>.  This conversion method
> assures that you receive a starting value in the new
> plan which is "actuarially equivalent" to the value of
> the benefit you had accrued under the prior benefit
> formula.

(Emphasis added.)

A few pages later, in a separate section, the 1999 SPD

stated:

> To recognize the transition to the Cash Balance Plan,
> all employees who were earning benefits under the
> prior formula on December 31, 1998, and who terminate
> on or before December 31, 2003, are eligible for a
> transition benefit.
>
> Under this provision, benefits will be calculated
> using two formulas -- the prior formula and the Cash

> Balance Formula -- during the five-year period from January 1, 1999 through December 31, 2003.  If you leave Morgan during this period and are vested, you will receive the larger of the two benefits.  <u>After December 31, 2003, your accrued benefit under the prior formula will be frozen and will continue to act as a minimum benefit.  When you leave Morgan, you will receive the larger of the minimum benefit or your balance under the Cash Balance Plan</u>.

> <u>If you leave Morgan after December 31, 2003</u>, your additional years of age and service will count toward your eligibility for early retirement benefits under the prior formula.  However, <u>the amount of your benefit will be calculated using your service and final average earnings through December 31, 2003</u>.

(Emphases added.)  An SPD effective September 18, 2000 (the "2000 SPD") made substantially the same relevant disclosures on the operation of the Cash Balance Plan and on the minimum benefit for former Morgan Plan participants.

After the Cash Balance Plan became the JPMC Plan, JPMC issued an SPD effective in the fall of 2005 (the "2005 SPD").  The 2005 SPD opened with a section labeled "Important Terms," which provided a list of defined terms "to help you better understand the plan."  One term in the list was "Minimum Benefit," which was explained as follows:

> In general, when a pension plan changes as a result of a plan merger or modification, <u>participants cannot receive less than any amounts they had accrued</u> or earned under that plan prior to the date of the merger or modification.  This amount is referred to as the "<u>minimum benefit</u>."  When you request a distribution, <u>that minimum benefit will be compared to your accrued benefit under the Retirement Plan and you will receive the greater of the two amounts</u>.  If you participated

> in the retirement plan of a heritage organization,
> <u>please see the appropriate Appendix</u> in this summary
> plan description for more information on minimum
> benefits.

(Emphases added.)  Later, in a section labeled "Appendices," the

2005 SPD again explained that

> [a]lternative rules and provisions may apply if you
> participated in the retirement plan of a heritage
> organization.  The rules and provisions affecting your
> situation may be described in one or more of the
> following Appendices -- which will depend on your hire
> date, the company originally employing you, and
> whether you have incurred a break in service.

It then directed individuals who were hired by Morgan "prior to

December 31, 2001" to review "Appendix C."

Appendix C, in turn, explained that if a participant was a

Morgan Plan participant, the JPMC Plan would provide that

participant "with a <u>minimum benefit</u> which is determined under a

prior plan benefit formula."  (Emphasis added.)  Two pages

later, a section titled "Minimum Benefit" set out three possible

minimum benefits based on the prior plan or plans in which an

individual had participated.  As relevant to plaintiff's minimum

benefit, the section stated:

> If you are eligible for the Morgan final average pay
> formula (which was incorporated into the [JPMC Plan]),
> you have a <u>minimum benefit</u> equal to your <u>accrued</u>
> <u>benefit under the final average pay formula as of the</u>
> <u>earlier of your termination of employment or December</u>
> <u>31, 2003</u>.

(Emphases added.)

The section then explained:

Each of these minimum benefits will be compared to
your cash balance benefit under the [JPMC Plan] at the
time you elect to receive payment.  If one of the
minimum benefits exceeds your cash balance benefit,
you will receive that minimum benefit.

Please Note:  In determining the value of a minimum
benefit, the plan uses your age at the date of
distribution and the annual conversion interest rate
in effect on that date to determine the lump-sum value
of any annuity benefit.  The interest rate can
significantly impact the lump-sum value of an annuity.
If the conversion interest rate is low, then the lump-
sum value will be relatively high.  If the conversion
interest rate is high, then the lump-sum value will be
relatively low.  The conversion interest rate changes
each year.

Keep in mind that the amount shown on your account
statement and on My Rewards @ Work reflects only the
benefit earned under the cash balance formula and does
not take into account this minimum benefit.  However,
projections prepared through accessHR will reflect the
greater of your cash balance formula or your benefit
provided under the final average pay formula.

(Emphases added.)

The 2005 SPD then provided a thorough description of the
calculations used under the final average pay formula.  This
section also explained to former Morgan Plan participants that

[i]f you were earning a benefit under the final
average pay formula of the 2001 Morgan Cash Balance
Plan in effect on December 31, 1998, you were eligible
to continue to accrue a benefit under that formula
until the earlier of your termination of employment or
December 31, 2003.

The amount of your accrued benefit under the 2001
Morgan final average pay formula was determined by a
calculation that took into account your age, salary,

> credited service, and Social Security covered
> compensation, <u>all of which were frozen as of December
> 31, 2003, or your termination of employment, if
> earlier</u>.

(Emphases added.)

III. The Pension Benefit Statements

Beginning in 2002, the JPMC Benefits Executive provided annual pension benefit statements (the "Benefit Statements") to participants in the JPMC Plan.  The Benefit Statements listed the amounts earned under the JPMC Plan's cash balance formula. For example, a 2019 Benefit Statement for plaintiff included a table showing his opening account balance as of January 1, 2019 and his closing account balance as of December 31, 2019.

Directly below the table listing the amounts in the cash balance account and in text roughly the same size as the text in the table, the 2019 Benefit Statement noted:

> This statement <u>does not reflect any minimum benefit</u>
> that you might have accrued under a prior plan
> formula.  If you would like more information about
> minimum benefits, you can call HR Answers.

(Emphasis added.)  The following page included a phone number for HR Answers.

IV.  The Election Packets

Pessin ended his employment with JPMC on March 24, 2019. On March 27, he received a pension benefit election packet, and in April 2021, he requested another election packet.  After

receiving the second packet, he followed up with a request for more information on how his pension was calculated.  JPMC responded by providing calculation worksheets for the two election packets.  The worksheets showed that Pessin's benefits under the final average pay formula in 2003 were higher than the amount in his cash balance account.  As a result, Pessin was eligible for the higher "minimum benefit" amount.

V.   Procedural History

Apparently surprised that his benefit was larger than he thought, plaintiff filed this action on March 25, 2022, asserting four claims for various ERISA violations.  On July 11, defendants moved to dismiss the complaint.  Plaintiff filed the FAC on July 27.  Defendants moved to dismiss the FAC on August 24.  The motion was fully submitted on September 30.

## Discussion

To survive a motion to dismiss for failure to state a claim, the complaint "must plead enough facts to state a claim to relief that is plausible on its face."  Green v. Dep't of Educ. of City of New York, 16 F.4th 1070, 1076–77 (2d Cir. 2021) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." Charles v. Orange Cnty., 925 F.3d 73, 81 (2d Cir. 2019) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "In determining if a claim is sufficiently plausible to withstand dismissal," a court "accept[s] all factual allegations as true" and "draw[s] all reasonable inferences in favor of the plaintiffs." Melendez v. City of New York, 16 F.4th 992, 1010 (2d Cir. 2021) (citation omitted).

In determining the adequacy of a complaint, a court "may consider not only the facts alleged in the complaint, but also documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." Sabir v. Williams, 52 F.4th 51, 54 (2d Cir. 2022) (citation omitted). "Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint." United States ex rel. Foreman v. AECOM, 19 F.4th 85, 106 (2d Cir. 2021) (citation omitted).

Pessin brings four claims under three sections of ERISA. For the following reasons, the motion to dismiss is granted.

I.   Section 404(a)

Pessin brings two claims under § 404(a) for breach of fiduciary duty -- one against the JPMC Benefits Executive and

another against the JPMC Board.  Section 404(a) provides in

relevant part that

> a fiduciary shall discharge his duties with respect to
> a plan solely in the interest of the participants and
> beneficiaries and --
>
> (A)  for the exclusive purpose of:
>
>> (i)  providing benefits to participants and their
>>       beneficiaries; and
>>
>> (ii) defraying reasonable expenses of
>>       administering the plan;
>
> (B)  with the care, skill, prudence, and diligence
>       under the circumstances then prevailing that a
>       prudent man acting in a like capacity and
>       familiar with such matters would use in the
>       conduct of an enterprise of a like character and
>       with like aims . . . .

29 U.S.C. § 1104(a).  The fiduciary obligations required by

ERISA are "the highest known to the law."  LaScala v. Scrufari,

479 F.3d 213, 219 (2d Cir. 2007) (citation omitted).  "When a

plan administrator affirmatively misrepresents the terms of a

plan or fails to provide information when it knows that its

failure to do so might cause harm, the plan administrator has

breached its fiduciary duty to individual plan participants and

beneficiaries."  Devlin v. Empire Blue Cross & Blue Shield, 274

F.3d 76, 88 (2d Cir. 2001) (citation omitted).  Because of this,

courts have held that the failure to explain adequately the

consequences of wear-away in a way that misleads an average plan

participant constitutes a breach of a plan administrator's

fiduciary duty.  See, e.g., Osberg v. Foot Locker, Inc., 138 F.
Supp. 3d 517, 555 (S.D.N.Y. 2015), aff'd, 862 F.3d 198, 215 (2d
Cir. 2017).

A.   Claim Against the JPMC Benefits Executive

The defendants' motion to dismiss the § 404(a) claim
against the JPMC Benefits Executive is granted.  Plaintiff's
claim hinges on whether the SPDs and Benefit Statements
sufficiently disclosed the problem of wear-away.  They did.  To
be sure, the relevant disclosures did not use the term "wear-
away," but they alerted plaintiff and other Morgan Plan
participants to how the transition to a cash balance formula
worked.  Beginning with the 1999 and 2000 SPDs, Morgan explained
that "after December 31, 2003," the calculation of participants'
benefits under the prior formula would be "frozen" and that the
December 31, 2003 amount would "continue to act as a minimum
benefit."  They likewise disclosed that participants would
"receive the larger of the minimum benefit or [their] balance
under the Cash Balance Plan."  Plaintiff does not dispute that
this describes the exact method by which his pension benefits
were calculated.

Describing the prior calculation as a "minimum benefit" was
not inaccurate, nor was it deceptive or misleading.  Using the
term "minimum benefit" implies that the calculation under the

14

cash balance formula could be lower than the calculation under the final average pay formula at the end of 2003.  If the cash balance formula were always higher than the final average pay formula, there would be no reason to promise the final average pay calculation as a minimum benefit.  Instead, the 1999 and 2000 SPDs suggested that the cash balance calculation may be lower than the final average pay calculation.  Because of this possibility, these SPDs promised participants that they would always have access to the minimum benefit calculated under the final average pay formula at the end of 2003.

Moreover, although the 1999 and 2000 SPDs were clear about how the transition to a new plan would work, to the extent there was any confusion created by those SPDs, it was rectified by the 2005 SPD and the Benefit Statements.  The 2005 SPD included in its opening list of "Important Terms" an explanation of how minimum benefits would work for participants of prior pension plans.  This explanation specifically directed the reader to review the appropriate appendix.  The appendix applicable to Morgan Plan participants in turn explained that those participants would receive a minimum benefit based on a prior plan formula.  It clarified that this minimum benefit would be compared to the participants' cash balance amounts.  And, it explained that if the minimum benefit "exceeds your cash balance

benefit, <u>you will receive that minimum benefit</u>."  (Emphasis added.)  Again, this is exactly what happened to plaintiff. Plaintiff's cash balance benefit was lower than his minimum benefit under the prior formula, so, as previously explained to plaintiff in the SPDs, he was entitled to the minimum benefit when he requested benefits election packets in 2019 and 2021.

The 2005 SPD also informed participants that their benefit statements would include only the amounts calculated by the cash balance formula, but that they could view "projections through accessHR" that would "reflect the greater of your cash balance formula or your benefit provided under the final average pay formula."  The Benefit Statements in turn included the participants' cash balance amounts, but they also clearly indicated that the statements "d[id] not reflect any minimum benefit that you might have accrued under a prior plan formula" and directed participants to "call HR Answers" if they wanted more information on minimum benefits.  The statements also included a number at which participants could contact HR Answers.

Given all these disclosures, the defendants satisfied any fiduciary duty they had to provide complete and accurate information about plaintiff's pension plan.  Plaintiff relies on two cases, <u>Osberg</u> and <u>Amara v. CIGNA Corp.</u>, 534 F. Supp. 2d 288,

346-48 (D. Conn. 2008), aff'd, 348 F. App'x 627 (2d Cir. 2009),
vacated and remanded on other grounds, 563 U.S. 421 (2011), to
argue that the defendants' disclosures about wear-away were
inadequate.  These cases are inapposite.

In Osberg, the plan participants "believed that they would
receive the full value of the benefits that they had earned
under the [prior plan] plus the benefits" under the new cash
balance plan.  Osberg, 862 F.3d at 205.  This belief was
justified because the SPDs in that case inappropriately and
inaccurately conflated the participants' cash balance accounts
and their ultimate benefits.  See Osberg, 138 F. Supp. 3d at
532.[1]  Here, by contrast, the SPDs make clear that plaintiff
could not be entitled to benefits under both the final average
pay formula and the cash balance formula.  Beginning in 1999,
the SPDs clearly stated that participants' benefits under the
final average pay formula would be "frozen" in 2003 and would
act as a "minimum benefit," and that participants would "receive
the larger of the minimum benefit or [their] balance" under the

---

[1] Specifically, the relevant SPD stated that participants'
"accrued benefit" was equal to the greater of the amount
determined under the new cash balance plan or their benefit
under the prior plan.  Id.  But the SPD defined "accrued
benefit" in relevant part as a participant's "accumulated
account balance."  Id.  Thus, the SPD incorrectly stated that "a
participant's account balance, not ultimate benefit, is the
greater of the two formulas."  Id.

cash balance formula.  (Emphasis added.)  Likewise, the 2005 SPD
stated that participants would receive "the greater of the two"
amounts after comparing the cash balance amount and the final
average pay amount.  And, unlike in Osberg, the SPDs here
sufficiently and accurately distinguished between participants'
cash balance accounts and their ultimate benefits.

In Amara, the defendants "intentionally withheld details
that would provide employees with a direct comparison of their
benefits" under the two benefits calculations.  Amara, 775 F.3d
at 530.  In fact, the defendant corporation "specifically
instructed its benefits department and consulting company not to
provide benefits comparisons."  Id.  There are no similar
allegations here.  To the contrary, the SPDs and Benefit
Statements directed participants to call HR Answers for more
information about benefit comparisons.  The 2005 SPD and the
Benefits Statements also explained why a person might call HR
Answers, namely, because the Benefits Statements did not include
information on participants' minimum benefits under prior plan
formulas.  Plaintiff does not allege that defendants would
withhold information about his minimum benefit if he contacted
the relevant representatives.  In fact, plaintiff acknowledges
that, when he asked for worksheets showing the calculation of
his benefits, he received calculations showing how his minimum

18

benefits compared to his account balance.  Thus, the plaintiff's cited cases do not apply.

B.   Claim Against the JPMC Board

The motion to dismiss the § 404(a) claim against the JPMC Board is also granted.  Pessin's claim against the JPMC Board is based on the alleged breach of fiduciary duty by the JPMC Board through its failure to monitor the performance of the JPMC Benefits Executive.  Courts have held that "[a]ppointing fiduciaries . . . have an ongoing fiduciary duty to monitor the activities of their appointees."  Burke v. Boeing Co., 42 F.4th 716, 730 (7th Cir. 2022).  Plaintiffs cannot maintain a claim for breach of the duty to monitor, however, "absent an underlying breach of the duties imposed under ERISA" by the appointee.  Rinehart v. Lehman Bros. Holdings Inc., 817 F.3d 56, 68 (2d Cir. 2016) (citation omitted).

Plaintiff does not dispute that his failure to monitor claim rises and falls with his breach of fiduciary duty claim against the JPMC Benefits Executive.  Because, as explained above, there is no underlying breach of fiduciary duty, the claim against the JPMC Board is also dismissed.

II.  Section 102

Plaintiff also brings a claim against the JPMC Benefits Executive under § 102 for failure to provide an SPD that meets

the requirements of ERISA.  Section 102 provides in pertinent
part:

> A summary plan description of any employee benefit
> plan shall be furnished to participants and
> beneficiaries . . . .  The summary plan
> description . . . shall be written in a manner
> calculated to be understood by the average plan
> participant, and shall be sufficiently accurate and
> comprehensive to reasonably apprise such participants
> and beneficiaries of their rights and obligations
> under the plan.

29 U.S.C. § 1022(a).  The relevant regulation provides in
pertinent part that "[t]he summary plan description shall be
written in a manner calculated to be understood by the average
plan participant."  29 C.F.R. § 2520.102-2(a).  It also explains
that proper description of the plan will usually require, inter
alia, "the limitation or elimination of technical jargon and of
long, complex sentences" and "the use of clarifying examples and
illustrations."  Id.  It also notes that "[t]he format of the
summary plan description must not have the effect of misleading,
misinforming or failing to inform participants and
beneficiaries" and that "[t]he advantages and disadvantages of
the plan shall be presented without either exaggerating the
benefits or minimizing the limitations."  Id. § 2520.102-2(b).
Courts have held that SPDs containing inaccurate and misleading
information about wear-away violate § 102.  See, e.g., Osberg,

20

138 F. Supp. 3d at 555; Amara v. CIGNA Corp., 534 F. Supp. 2d at 346-48.

Plaintiff's § 102 claim is dismissed for largely the same reasons as the § 404(a) claims.  The SPDs clearly and accurately explained how plaintiff's benefits would be calculated. Further, to the extent the 1999 and 2000 SPDs were misleading, the 2005 SPD cured any defects.  The 2005 SPD explained the minimum benefit in the opening list of important terms and directed participants to refer to the relevant appendix for more information.  That appendix detailed the minimum benefit calculation and its comparison to the cash balance calculation. It also provided an illustration for why the minimum benefit might exceed the cash balance calculation.  Nothing in the relevant language is excessively technical or complicated. Thus, there is no basis to find a § 102 violation here.

Plaintiff's arguments again rely on Osberg and Amara.  For the reasons outlined above, however, those cases are meaningfully distinct from plaintiff's case.  Accordingly, plaintiff's § 102 claim is dismissed.

III. Section 105

Finally, Pessin brings a claim against the JPMC Benefits Executive under § 105 based on the alleged failure to provide

21

pension benefit statements listing the participants' total

accrued benefits.  Section 105 provides in relevant part:

> The administrator of a defined benefit plan . . .
> shall furnish a pension benefit statement --
>
>> (i)   at least once every 3 years to each
>>       participant . . . who is employed by the
>>       employer maintaining the plan at the time
>>       the statement is to be furnished, and
>>
>> (ii)  to a participant or beneficiary of the plan
>>       upon written request.

29 U.S.C. § 1025(a)(1)(B)(i).  It also explains that the pension

benefit statements "shall indicate . . . the total benefits

accrued."  Id. § 1025(a)(2)(A)(i) (emphasis added).

The motion to dismiss the § 105 claim is granted.  The

Benefit Statements received by plaintiff showed the amount in

his cash balance account and indicated that he could determine

his minimum benefit by calling HR Answers.  Again, there is

nothing excessively technical or complex such that the Benefit

Statement could not be understood by an average plan

participant.

Plaintiff argues that the Benefit Statements do not reflect

the "total benefits accrued" because they list only the amount

calculated under the cash balance formula and not the final

average pay formula, which constituted the "total benefits" that

plaintiff had accrued.  But the statute requires only that the

statements "indicate" the total benefits accrued.  The Benefit

Statements in this case indicated plaintiff's benefits because they informed him that he would receive either the listed cash balance amount if it was greater than his minimum benefit or, if not, the minimum benefit.  They also indicated that he could find this minimum benefit number by calling HR Answers.

The fact that the statements did not also expressly list the minimum benefit is immaterial.  Indeed, had JPMC included the minimum benefit on the statement in addition to the cash balance amount, the statement may have been confusing for an average plan participant because it could have incorrectly suggested that participants would receive both amounts.  JPMC needed to provide benefit statements to all its employees.  For any employees hired after the JPMC Plan became the controlling plan, minimum benefits under prior formulas would be irrelevant. Thus, it was not inappropriate for the Benefit Statements to indicate the amount calculated under the cash balance formula, with a disclaimer inviting the subset of employees who were participants of former plans to call for information about their minimum benefits.

## Conclusion

The defendants' August 24 motion to dismiss the FAC is

granted.   The Clerk of Court is directed to close the case.


Dated:     New York, New York
           December 9, 2022


                                    _____
                                    DENISE COTE
                                    United States District Judge